MEDORA A. HARROUN and ALBERT O. FENN, as Administrators, etc., of FRED J. HARROUN, Deceased, Respondents, v. THE BRUSH ELECTRIC LIGHT COMPANY, Appellant.

*Negligence.— electric light company — defective insulation — evidence as to the condition of the wires before and after the accident — charge as to the company's duty.*

What facts are sufficient, in an action based upon the negligent killing of the plaintiff, to warrant the submission to the jury of the question whether the defendant, an electric light company, was negligent in the care of its lines and lamps, and as to the duty of the decedent to wear rubber gloves while trimming the electric lamps, considered.

On the trial of such an action it is not error to allow one of the plaintiff's witnesses to testify that three days after the accident he found the insulation on the wires worn away, where it is shown that, when the witness inspected the wires, they were in the same condition as at the time of the accident, and defendant does not controvert the fact that the insulation was then worn away.

It is not competent for the defendant to prove that no accident had happened before on the wires in question without showing that the same conditions existed.

The court may properly charge "that care and prudence must be proportioned to what may properly be expected of him (the employer) under the circumstances, and increase in a corresponding ratio with the danger and hazard necessarily connected with the use of the appliances."

APPEAL by the defendant, The Brush Electric Light Company, from a judgment of the Supreme Court in favor of the plaintiffs, entered in the office of the clerk of the county of Monroe on the 29th day of May, 1895, upon the verdict of a jury rendered after a trial at the Monroe Circuit, and also from an order entered in said clerk's office on the 24th day of May, 1895, denying the defendant's motion for a new trial made upon the minutes.

*Joseph W. Taylor*, for the appellant.

*Charles Roe*, for the respondents.

FOLLETT, J.:

This action was begun January 7, 1895, to recover damages occasioned by the death of the plaintiffs' intestate, caused, it is alleged, by the negligence of the defendant.

In 1894 the defendant was engaged in lighting by electricity the

streets, dwellings and places of business in the city of Rochester and in supplying electrical power. For two years before his death, which occurred September 11, 1894, Fred J. Harroun, plaintiffs' intestate, had been employed as a lamp trimmer. About fifteen minutes after seven o'clock in the morning of Tuesday, September 11, 1894, while engaged in trimming a Brush street lamp at Wolff park, he was killed by an electric shock. No person saw the accident. This lamp, when burning, was held in position by a wire cable, called a tail guy, extending from the lamp to the pole to which it was secured by a padlock. To trim the lamp it was usual to unlock the tail guy and lower the lamp part way to the ground so that it could be reached when the trimmer was standing on a short ladder. This lamp was on circuit or wire No. 12 for lighting the streets. On the same arm and pole was a wire known as circuit No. 18 for the transmission of power and which is called "power wire." These wires were from twelve to eighteen inches apart. The evening before the accident a current of electricity was turned on to No. 12 at seven o'clock and fifty-five minutes, and on the morning of the accident it was turned off at five o'clock and five minutes, and on this morning the current was turned on to No. 18 at seven o'clock, and the custom was to turn it off at midnight. Between five o'clock and five minutes A. M. and seven o'clock and fifty-five minutes P. M., No. 12 was, in electrical parlance, "dead," and No. 18 between seven A. M. and midnight was "alive."

The plaintiffs' intestate was found lying on the ground grasping the iron frame of the lamp with his left hand, which was burned to the bone by the current, which caused his death.

Whether the intestate took hold of the frame of the lamp with his left hand for the purpose of trimming it, received the shock and fell, carrying down the lamp and breaking the tail guy, or whether the tail guy broke when he attempted to lower the lamp and he seized the lamp to prevent it from falling, and so received the shock and fell to the ground with the lamp, is not known.

The evidence establishes, beyond doubt, that wires Nos. 12 and 18 were crossed a short distance from the scene of the accident, and No. 18 was in contact with the tin cornice of a building on State street, where the insulation of No. 18 was worn off, and so "a ground" was formed.

It is conceded that the current which killed the intestate was communicated through the iron frame of the lamp. It was established that if this frame had been at the time properly insulated the current could not have been communicated to and through it to the intestate. The plaintiffs insisted that the lamp frame was defectively insulated. The defendant insisted that the frame was properly insulated, but that a sparrow had built a nest on the lamp frame near the wire communicating with the lamp, which was saturated with moisture and formed a conductor between the wire and the frame of the lamp, and that it was the duty of the intestate to keep the lamps free from birds' nests, and that by his failure to do this he contributed by his negligence to the accident. This issue was sharply contested before the jury and evidence given which would support a finding for or against the defendant.

It was also shown beyond dispute that the defendant's wires were carried through trees, with the limbs of which the wires were sometimes in contact, and that the swaying of the limbs crossed the wires on many occasions. It was also shown that the insulation on the wires, where they passed through trees, was worn off so that when a dead wire was in contact with a live wire, and there was a ground, the electrical current was communicated to the dead one. It was also shown that wire No. 12 had been in use for ten years and wire No. 18 for five or six years, and that weather-proof insulation on such wires ceases to insulate effectually after eight or ten years. It was also shown that the wires were crossed at this place between three and four o'clock in the evening of the day before, and while in contact they emitted light, and that the heat burned away the insulation. There was considerable evidence that at different points, on wires Nos. 12 and 18, the insulation had from one cause and another worn off so that the wires were not effectually insulated.

An electrical engineer, Mr. Putman, who examined this lamp on the 14th of September, 1894, the third day after the accident, testified that the carbons were in contact with the shadeholder, which was not insulated from the frame of the lamp, and that there was nothing to prevent a current of electricity from passing from the carbons through the shadeholder and into the frame of the lamp. He testified in the most positive terms that the lamp was imper-

fectly constructed, the defect being the ability to cross the shade-holder with the carbons. He testified: "With the insulation of the lamp as I found it, under some conditions, I should say, the current would be communicated into the frame with sufficient force to kill a man who took hold of it. If the man did not take hold of the frame at all, the current would surely go right on through the wire. If he took hold of the frame and formed a ground by standing on the ground, under certain conditions he might form a short circuit, and the current could go through him. If the insulation of the lamp was proper, the current of electricity could not get away from the wire and into the frame."

Defendant's foreman testified: "If it (the lamp) was properly insulated, the frame would be harmless to handle." The theory of the defendant, that the electrical current was communicated to the lamp frame through the bird's nest, being discarded by the jury, the theory of the plaintiffs, that the lamp was defectively insulated, is justified by the evidence.

Other evidence was given tending to show that the insulation of these wires had been worn away in various places, and that the wires were so run through trees that they were frequently crossed. Other evidence was given tending to show that this lamp was defectively insulated, but enough has been quoted to show that a question of fact was presented for the jury to determine whether the defendant was negligent in the care of its line and lamps, and the verdict of the jury should be sustained. There was no evidence that the negligence of the intestate contributed to the accident. The negligence alleged is that he did not wear rubber gloves when trimming the lamps, and did not clear away the bird's nest. All the evidence is to the effect that gloves are not worn when trimming lamps on dead wires, but are used in the night time on live wires. The defendant's witnesses testified to this, and also to the further fact that it would be impossible for a trimmer to do the amount of work required of him if he used gloves.

It is urged that the court erred in permitting a witness to testify to the condition in which he found the wires three days subsequent to the accident. It was proved that the wires were then in the same condition that they were at the time of the accident, and before,

and the evidence of the witness was simply to the effect that the insulation was worn away in many places, which was not controverted by the defendant.

The defendant asked its foreman: "Did you have any trouble which resulted in an accident on circuit 12 or 18 before the accident to Harroun?" This was objected to as immaterial, the objection was sustained, and an exception taken, and the ruling is urged as an error. Subsequently, the same witness was permitted to testify: "Before this accident no report was made to me of any trouble in the insulation of the wires on Jay street on circuits 18 or 12. If there was trouble, I am the person to whom it would be reported." Besides, it was not competent for the defendant to prove that no accident had happened before on these wires without showing that the same conditions existed.

Two exceptions taken to the charge of the court are argued. The court charged: "Then, in cases like this, where the action is between employer and employee, two other rules apply, which have no place in a case between a corporation and an outsider not connected with it. The first of those two rules is that it is the duty of the employer to furnish safe machinery, tools, appliances, and a safe place in and with which the employee may work. In this case, so far as that question applies, we have to deal wholly with appliances. The question of place does not enter into our consideration. All of this work which the deceased was required to do, was done out of doors, and the question, so far as the duty of the employer is concerned, related wholly to the question of appliance. The law requires not that degree of diligence and foresight which is required of an insurer, or which the law might require of a corporation, towards the public, but simply reasonable care and prudence in the selection of safe and suitable appliances for the use of employees. You will readily apprehend that this term, reasonable care and prudence, is, however, a relative one, to be determined by the nature of the thing which is required of the employer. So that what would be sufficient care and foresight in one case would, perhaps, be utterly inadequate in another, and I think it may fairly be said that, while in a general way the law requires simply reasonable care and foresight by the employer in the selection and provision of appliances for the use of the employee, *that care and prudence must be*

*proportioned to what may properly be expected of him under the circumstances, and increases in a corresponding ratio with the danger and hazard necessarily connected with the use of the appliances."*

The italicised portion of this instruction was excepted to. It seems to me that there was no error in the instruction given. It is well settled that the degree of care required is measured by the danger of the forces employed.

The court instructed the jury that the intestate had a right to assume that wire No. 12 was dead, and that no act of omission or commission on the part of the defendant would contribute to make it a live one. All the evidence is to the effect that, at this time in the morning when the lamps were being trimmed, wire No. 12 was supposed to be dead, and that trimmers were not set at work trimming lamps on live wires, and the intestate had the right to assume that the wire was dead, and that it would not be made alive and dangerous by any negligent act of the defendant. The only possible criticism that can be made upon this instruction is that the court did not use the word "negligent," but no exception was taken upon this ground, and the jury must have understood, from the whole course of the trial and the charge, that the defendant was liable only for negligent acts of omission or commission.

We find no error in the record which calls for a new trial.

The judgment and order should be affirmed, with costs.

All concurred, except Adams, J., not sitting.

Judgment and order affirmed, with costs.